Council, when you're ready, please proceed. Thank you, Your Honor. Andrew Casey on behalf of Lucas Morton, Your Honor, I need to talk about Ferretta, but I need to detour very quickly before I get to Ferretta to discuss one additional answer to the custodial interference statute that was just argued about. I have two citations that were raised by Ms. Donnelly that I think are dispositive here. First is state versus left hand, which is that 2015 NMCA 117 at paragraph 19 as well as Brassell versus State 259 Georgia 590. Both of which are interpreting the Georgia and New Mexico statutes and saying things like the absence of the court order would equal no violation of a parental interference, but more. You talk faster than I write. Can you give them to us again, please? State versus. I have state versus left hand, 2015. Can you spell the party name? Yeah, it's actually just left hand, L-E-F-T-H-A-N-D. Okay. And then Brassell versus State. I have Brassell. With each of these cases, there is a lively discussion about the necessity of a court order. In fact, in that left hand case, it indicates that the venue for it would lie in the court where the order was violated or where the injury of the taking occurred, which in all of these cases would be Georgia. So in that interpretation of both Georgia law and New Mexico law, the interference arguments made by the government don't hold up. I do need to get to Ferretta. This is a few different things I'd like to note about it. With the Ferretta issue, the district court violated Mr. Morton and Mr. Wahad's Sixth Amendment rights to self-representation under Ferretta versus California by excluding the defendants from all bench conferences and jury note conferences. The first issue that I need to take up is the nature of the court's modified bench conference procedure and that it still violates Ferretta because it substantially reduces the defendant's control over their case. And it otherwise does not allow these pro se defendants to speak freely on their own behalf. And instead, they have standby counsel speaking instead of the defendant on any matter of importance, which are direct lines from the litany of case law that are controlling for how the decision works. Did the defendants consent to that procedure? No, Your Honor, and I just want to go over the history of the procedure real fast so that it can be memorialized. The first instance of a discussion of the procedure is at the pretrial conference that was held on September 20th. At this one is where standby counsel, with defendants present, asked how we were going to do bench conferences. And that's where the court made the first announcement about them essentially serving as a go-between. That's the record at 4153 in Volume 6 through 4156. At pretrial as well, at 4157, it was also asked by the government on bench conferences, would pro se defendants be coming to the bench? And the answer was no, it would be standby counsel. So the consent was eliminated whenever the first objection arose on September 27th. And that's in Volume 6 on the record at 1132. That's the objection that is made by Siraj, which was ruled by the court. And then it was noted that he had preserved that for appellate records. It was then joined by Mr. Morton. And there the modified procedure occurs. And the modified procedure essentially comes down to Siraj saying the real-time transcript is not working. It's not going fast enough. And we understand your ruling about the bench conferences, but he essentially made the argument we want to be making the bench conferences. And the response from the court was letting them preserve the objection and then indicating we would give you more time, we would slow down before we proceed, and if need to, remove the jury. The government assumes that this means, well, I want to talk specifically then about whether or not they later acquiesced based on that. The preservation of the error under both Rule 51B, Rule 51A, as well as the McCaskill decision at 178, and the France v. Haley decision at 744, all indicate that they don't have to take exception to that to keep preserving that objection. And in each one of those, in McCaskill and France, it is specifically denoted that the initial invocation of the right of self-representation is, quote, generally sufficient to establish that any participation by standby counsel other than for routine matters is, quote, over the defendant's objection and counts as an unambiguous request that standby counsel be silenced. So I think that answers cleanly the preservation as well as any forfeiture or acquiescence arguments. Well, I guess my question on that, and I'm looking at the pages, is there is the very specific objection that either the delay or the lack of functioning of the real time is a problem, and the district court listens and says, well, fair enough, and then says, well, creature's a habit, so forth. I think what I need to do is give you an opportunity, give standby counsel an opportunity to talk to you before we proceed, so I'll start doing that. And then he says, I'm going to slow things down so that you and Mr. Morton have an opportunity to weigh in. And both of the clients say, well, Mr. Morton says, I join, and Mr. Wahaj says, thank you, Judge. How do we know that that didn't work? And absent another objection. First is that it was no longer on the burden on the defendants to raise an argument that it wasn't working in terms of their desire to be up and be talking with the court while a bench conference is happening. And I'll note a couple of different. So you're saying even if it did work, it's still a violation? Yes, and I think the big problem is also the go-between. The serving as the messenger back and forth in this case resembles very clearly the McDermott decision on having the lawyer handle the legal matters and then having that come back to them to essentially report the ruling. And a couple of things I think animate this, and it'll go to whether this was an insignificant incursion or not, is some of the topics that were being discussed at bench conferences were in the middle of cross-examination by co-defendants. So, for instance, I have what looks to be three pages of cross-examination where Lucas Morton is speaking, and a bench conference is held while he's doing an examination, but the bench conference is held away from him. And that happens at 1483 to 1485. It happens at 1509 to 1512. And in each one of those, you know, we have a situation where it's not something where he's at the podium with the court being able to shape his defense, which is something that is imperative under the McCaskill decision. So you're saying anything absent allowing him to come to the bench is a violation? In preparation for this, I think I thought of a number of different ways, you know, imagining a perfect world where we have absolutely working real-time feeds or, you know, in Western districts sometimes I see the headsets being used, and we put on the gray sound, and from the headset we can be making arguments back and forth. But the real question here is a question of participation. And I think that's important under the case law. But what's the answer? Is it just a straight reversal absent being allowed to come to the bench? Because it's structural error, yes. Right. What Mr. Wahaj says is, I understand that for security issues you may not want me to approach, but thus far I follow all the rules and procedures. You have armed marshals, and I'm willing to do if you want the marshals to approach with me on the bench conference for security matters. Are they shackled? We have another instance where one of the females is going to, wants to address the court on FREDA, and they have to unshackle. So I assume the defendants are shackled. There was a shackling case where there were out-of-the-jury conferences that, I think it's Lefebvre, where specifically in those outside-of-the-jury conferences, the defendant was still there and able to participate, so the shackles didn't matter. I would say here that that question is one that, hey, I don't have that answer right now in my head about the shackling existing. But I would also say that I would be skeptical of making a decision about security concerns justifying the modified procedure because of three reasons. Number one, that was not a reason that the court had identified to do the modified procedure. Number two, there were those cited failed pretrial meetings where everybody was meeting as a group, but the way that that was established in the record and in all the motions was a distinction of opinion between the marshals and defense counsel about whether or not they were having conversations with each other, whether or not they were touching or hugging each other because they're family. That didn't arise to a security concern that was identified by the district court. And I will know that, as you pointed out, Siraj explicitly denied that there is a security concern in his objection and tried to be forthcoming about that argument and was not corrected by the district court and was not told by the district court, no, I'm keeping you at the table because of a security concern. Well, no, actually, he says, I understand that for security issues you may not want me to approach. And I just want to get a feeling of what's required. What would have done the job so there wasn't a problem? We have 20 to 40, I forget how many, bench conferences. Is your position that to meet the minimum constitutional standard that both of them had to come to the bench for every single bench conference and if they're shackled, then excuse the jury or whatever else? What should the district court have done to avoid it? As the technology exists and I understand it, barring the more perfect world that I described a minute ago, I believe that they needed to be brought up for bench conferences or the jury excused for the bench conferences to take place. And there were 46 bench conferences, I think. 46 or 48. It was a lengthy number, a lot of which were substantive. Well, but let me, I mean, that's a lot of times to excuse the jury and involve the defendant. And I read McDermott as not having a per se rule because it notes that it's a fact specific analysis, right? And that some minor incursions will fall short. And it seems to me you have this modified procedure and I understand that you can't allow the counsel to fulfill the role of a pro se defendant. But the defendant, if they slowed it down and he's got the real time transcript in front of him of what's going on in the bench conference and, in fact, the court is allowing time for his standby counsel to come and discuss with him everything that's going on and then take whatever he says and present it to the court, would that be enough? Here's one. I do want to make sure. Well, first answer yes or no. Would that be enough? So the hypothetical would be if there is absolute enough time to confer back and forth. Which we don't know because the court said we're going to slow it down and then we never had another objection. I understand that. That's true. Would that be enough? I would be hard pressed to say that in the instance of a bench conference, there's still not a problem with participation. Here's why the conference is important. In the question of conferring and that participation, the case law in France, for instance, discusses needing to be able to reasonably anticipate the argument and prepare and rehearse with counsel before that part of the proceeding, before counsel goes up there. And I think that's something that can't be predicted in terms of every argument that the government is going to be able to make. And if the court's concern is taking the jury out of the room has a lot of time, well, so does, you know, the same procedure that we're identifying. I don't think any of this, though, answers the question about the fourth jury note and the exclusion of the defendants from that because the modified procedure didn't. Let's switch to all the jury notes. The defendants were not involved in any of the discussions about what to do about the jury notes, right? They were present in the courtroom, I believe. For the first one. Yes. Right. And then there's some factual question about the level of conferring for the third one. And it is clear from the fourth one, which had a question about the jury note that was specific to Mr. Morton and that level of guilt, and he was not. And that's where standby counsel, I believe, had said, this isn't a substantive matter. Well, under the case law, it's certainly a matter of importance. It is not an insignificant incursion. Even if, after, you know, you read the France v. Haley decision, even if the court would have ruled the exact same way after hearing the exact same statements, that's still structural and had to be preserved as a matter under Ferretta and all of the case law, which is why this is much closer to McDermott instead of McCaskill. Thank you, Your Honors. Thank you, counsel. I can, for the record, Tiffany Walters for the United States. Turning to the bench conference issue, Siraj and Lucas acquiesced and forfeited their right to object to the bench conference procedure after the district court announced the procedure, as we discussed, and then the district court provided the opportunity that if the judge   stand-by counsel went back to the table and talked with the defendant and the defendant had an issue, stand-by counsel could go back up to the court and say, if that was an issue that the defendant wanted to speak directly to the court, this is important to me, I want to have the jury sent out and know that the court couldn't do that for all, you know, 58, but that gives them the opportunity to weigh in on the issues that are important to them and flag them from the court, and then the court can make a different decision as to those cases. And we know that the court was willing to do this because when Lucas's counsel made a motion for mistrial, the court did just that, they came up to the bench and the district court recognized this as an issue of importance that Lucas needed to have the opportunity to speak directly to the court on, and so it chose to wait until after the jury was out to call them back in and then allow, in this case, Lucas actually deferred to stand-by counsel, but he had the opportunity to present his motion directly to the court if he so wished. So under those circumstances, the pro se defendants needed to do something to alert the court that the modified procedure wasn't working. They couldn't just sit on their hands for two and a half weeks, let the trial continue, and then at the end decide that that was an incursion into their rights, and this is even more important in this case where stand-by counsel are playing a significant role in the case. They're making objections, they're arguing motions, and this is all with Lucas and Suraj's consent, and McCaskill specifically says when you have a situation where counsel is weighing in and it's sort of a confusing back-and-forth situation, then the burden is on the pro se defendants to make clear and unequivocal statements that they want to be able to speak directly to the court, and I think if the court looks to Lefebvre, that was a case in which they did have a shackled defendant, and the court said that that would have been one of the ways that they could have dealt with that situation, is that you could send the jury out and then the defendant could address the court directly. So there are options, but Ferrara doesn't guarantee defendants a per se right to always approach the bench, and there's obviously cases with security concerns where the district court needs the discretion to be able to shape procedures. Here the district court did not say this is because of security concerns. It didn't, but even Suraj was aware that that was in play, and I think that was in everyone's mind in the courtroom. So while there's not a direct ruling on it, it's certainly part of the discussion. If they had said this modified procedure is not working and we want to be at every bench conference in person, would the court under Ferrara, would the court have had to figure out a way to do that? I think you still have limitation on matters of importance. Some of these conferences are literally just do we want lunch now or later, scheduling issues. That's not a matter of importance. But there are some that are. There absolutely are, yes, and I think in that case, the court would need to either develop a procedure for allowing them to approach or deal with the headphones or perhaps send them out. There would be different ways the court could have handled that, but it needed to know that that's what the defendants wanted, and it needed to know which conferences that that needed to happen. But to say that they had an absolute right to approach on every single conference, whether it was an objection made by a co-defendant to a different issue, especially in a four-defendant trial, not every single one of those bench conferences were matters of importance as to Siraj and Lucas, so they needed to speak up. And they had the opportunity to speak up, and they didn't use that opportunity, even though the district court modeled it. On the headphones, if you use those, can the defendant actually orally participate in the bench conference, or can they just hear it rather than reading it on the real time? I don't know. I haven't actually been involved in that, so I don't want to speak to the court's technology on that. What about the jury notes? I mean, it seems to me that figuring out what to do to respond to a jury is one of those things that can be pretty tricky, and the defendants didn't even get an opportunity. They didn't even know about the fourth jury note, did they? I don't think they did. It came in while they were in conference on the third note. So we're talking about one conference that combined both the third and fourth notes. So in that situation, I think looking... Certainly jury notes can be matters of importance, and I think Franz Vikesi exemplifies when that can happen. In that case, it was a question of the admission of a 901 tape, and the defendant had made clear that this was a core issue to the defendant. It came up over and over again during trial, and so certainly in that situation, that is a matter of importance. Here we have a situation where the question is really about jury instructions, and the pro se defendants had deferred to their standby counsel at the jury instruction conference. They participated on their behalf. There are instances on the record where the defendant conferred. Conferred, but they did not speak. They're there, they can hear it, they can participate. Correct. So, I mean, here the defendants have no opportunity to even know the question was asked or to give input on how they'd like the issue resolved. That's correct, and I would note that even on appeal, they haven't identified anything that they would have said that would have been different or that would have been resolved differently. Or do they have to? I don't know that they have to, but I think it is a consideration in terms of whether or not it was a matter of importance, and both the counsel there and the judge did not believe this was a matter of importance because it was really just telling the jury to go back and read its jury instructions. On the question of armed, there is no legal definition for armed, and on the overt acts, which we did address in our brief at page 176, it was clearly laid out in the jury instructions, and so there wasn't anything more to do than to tell the jury to go back and reread its instructions. But even if the court was concerned that this was a matter of importance, McCaskill talks about whether or not there's an erosion by prohibiting the defendant from speaking on his own behalf. Not that every single time that a defendant isn't given the opportunity to speak on every matter of importance, that that is a per se, forever violation. And McDermott also declines, as Judge McHugh mentioned, to adopt a per se rule. So I think to the extent that this one jury note conference did preclude them from speaking on a matter of importance, it was more in the nature of an erosion than rising to the level of a full violation. And even in McDermott, the court discusses the Second Circuit's decision in Mills as an example of where the erosions don't rise to the level of violation, and I think that reflects the analysis where we're not looking at, you know, if there's any one misstep, that's enough to establish a forever violation. We're looking at the entire trial in context. And here, the district court scrupulously honored defendants' per se rights to speak, to argue motions, to question witnesses, to introduce evidence. They clearly were presenting their own case in their own way, and that is the core of the Faretta right. And the district judge in this case went to great lengths to ensure that that was honored. Are there any other questions on bench conferences? Apparently not. Just briefly as to the citations, I'd like the opportunity to read left-hand and respond in a 28-J letter, if that's acceptable to the court, and then Brasel. I do believe we discussed that in our brief. I think left-hand may be referencing Sanders, which I believe Hoodra cited in her reply brief. In that case, I'd just like to point out that that involved a different version of the New Mexico statute, and while it did require a custody order, the custody dispute was between the state and the father, not the father and the mother. And the state, of course, has no inherent right to custody of the child, so I think that's a very distinguishable situation. As far as left-hand, I need to look at that, and I will get back to the court on that. Let's see. What about, nobody's touched on it, but we have an argument by Lucas Morton that the motion to suppress should have been granted and that they indeed had standing to bring that motion because he had some kind of a tenancy on Lot 28. How do you respond to that? I would say first that the court doesn't need to go into the ins and outs of New Mexico property law from the early part of the 20th century because the Fourth Amendment focuses on that reasonable expectation of privacy. And here Lucas had none. The defendants had none. So here Lucas knew from the get-go that he was on the wrong lot. The Badgers told him this, and they arranged for a land swap. And while the Badgers did allow them to remain on the property while this land swap was being negotiated, there was a contractual agreement. Lucas failed to perform on that, failed to pay the consideration costs. The agreement terminated, and the Badgers informed him in no uncertain terms that he needed to get off the land through text messages, through filing a civil suit, although that was ultimately filed in the wrong court. The Badgers were proceeding per se, and it was dismissed for lack of jurisdiction. And then also through serving a trespass notice, which was attempted. Lucas indicated that he inherited the right to the land from his creator, which suggests that he was well aware that he had no legal rights to that property, and then pointed to the civil case. And then at that point, there was a delay in serving the trespass notice until the actual date of the search due to the ongoing investigation and security concerns presented by defendants. During the period of time where they had permission to be there and they were under this contract, during that period of time, do you think they had a reasonable expectation of privacy? Yes. And so your position would be that once that contract failed and they were told to get off the property, that they then took the status essentially of squatters? Yes, exactly. I think Lucas's position is that unless and until, I'm sorry, we get an eviction order, they have a right to that property. But the eviction order, first of all, they weren't entitled to eviction proceedings because this wasn't a lease agreement for a dwelling unit, so that law doesn't even apply. At most, we're looking at an unlawful detainer action that doesn't resolve legal rights, that just says it acknowledges the party's positions and enforces the wrongful party to get off the land. So I think in that circumstance, there's no reasonable expectation of privacy. He knew full well that he had no right to be there. He relies heavily on the Thomas case out of the Seventh Circuit. That's a case with a tenant who's paying rent to a landlord, and no one has any idea that there's anything wrong with the lease. That's certainly, under that circumstance, it makes sense that there would be a reasonable expectation of privacy. This is not that. He knew full well that there was no right to stay on that property. He had no defense that could have been asserted in any sort of proceeding anyway, which is evident from the claim that he inherited the property from his creator. And I'd like to just quickly have you look at the argument that the government committed reversible prosecutor misconduct in its closing argument. I guess first, because I think we're under plain error here, the first question is whether the comments were improper at all. It does seem to me that saying the Constitution, as we know, provides all of us the benefit of doubt, but the defendants have now used up all the doubt they are due. That seems a little problematic to me, that statement. I mean, would you at least concede that that's not a good thing for the prosecutor to be saying to the jury? I think that wasn't an artful statement, and it was in rebuttal closing. These are extemporaneous statements. Certainly, perhaps in retrospect, we would have phrased that differently, but this Court has held that a single comment shouldn't be given its most nefarious reading in the context of prosecutorial misconduct, and we have to look at everything as a whole. And shortly before that, the prosecutor had correctly stated the reasonable doubt standard. This is very different from the Starks, Petro, Mahorny line of cases, because those are all presumption of innocence, and those misstatements fell clearly within the parameters of what was prohibited. In Petro, this Court even acknowledged the difference between reasonable doubt and presumption of innocence, and that a prosecutor is allowed, in closing, to say that it's proven its case beyond a reasonable doubt. And I think that's what these comments were getting at, although perhaps could have been phrased better. So your argument would be that they can't meet the third prong of plain error because they can't show that there was any prejudice to Lucas? Correct. We would also say it's not plainly erroneous on its face, it's most ambiguous. But I think the Court doesn't even need to address that because it can resolve this case on prong three, and that is because there's no reasonable probability that this made a difference. There was so much instruction about reasonable doubt. Here we have a very different situation than Starks and Petro. The jury is instructed with a reasonable doubt instruction right before closing. This isn't two days beforehand. This isn't any sort of unusual timing. We don't have the cumulative error situation of Starks. We don't have the egregiousness of Petro where the prosecutor is showing a naked picture of the defendant. We just have this very limited comment. And in this situation, we also know that the prosecutor did not dilute in the jury's mind the reasonable doubt standard because they, in fact, acquitted Kudra and Subhana of the material support charges. So we know that the jury understood its duty to not convict unless the government had proved this case beyond a reasonable doubt because it, in fact, did that in that situation. Unless there's any other questions. Prosecutor, I'll misconduct. Apparently not. Thank you. Thank you. We can always ask them next time. Counsel, your time expired, but I'm going to give you two minutes if you want. You don't have to take it for rebuttal. And make sure you abide it unless you get a question after that period. If I can, Your Honor, I would like to talk about that last set of arguments. I think that the Mahorny decision, if you look at the statement that was objected to and that was the error, the statement was about both the presumption of innocence and the beyond a reasonable doubt standard. That is a 1990 case that exists there, which means for the fourth prong of plain error, that's a published Tenth Circuit decision where a court had reversed that conviction based upon the use of the beyond reasonable doubt standard. That specifically applies and extends Petro. Are you talking about Starks? Or what case are you talking about?  Mahorny v. Wallman is the 1990 decision that I'm thinking. One other thing that I'd like to discuss, the government has attempted to establish, contrary to Petro, that this is a lot easier of a decision for a jury. Reading the court minutes simply alone about the length of the deliberations happening over the course of multiple days is not just something that I think is important in light of the Petro decision, which of course said 20 minutes, 26 minutes might be hasty. But over that course of time, that's a much more complicated set of fact patterns. And I think one of the things that has to be remembered is it is the very last thing that is said right before the jury is sent out for deliberations. So similar to the other cases that we've cited where the instructions were read well before, this is, as far as primacy and recency, one of the last things that they hear where they're being told reasonable doubt has been given all that it's due. It is used up, which speaks directly to the bedrock of the criminal justice system no differently than the presumption of innocence. Because the presumption of innocence and beyond reasonable doubt, in my mind, are intrinsic to each other. They are coterminous with that same bedrock. They cannot be explained without each other. And that's an issue for me. Any further questions? You had two seconds to spare. Thank you, counsel. It's an honor to be here. Thank you all so much for having me. Thank you for your arguments. The case is submitted. Counsel are excused.